**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **FULYA EREN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 3:13-cv-0359** |
| | ) | **Judge Trauger** |
| **v.** | ) | |
| | ) | |
| **MARS, INC., d/b/a** | ) | |
| **THE NUTRO COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM</u>**

Pending before the court is a Motion for Summary Judgment filed by the defendant, Mars, Inc., d/b/a The Nutro Company ("Nutro") (Docket No. 37), to which the plaintiff, Fulya Eren, has filed a Response in opposition (Docket No. 39), and the defendant has filed a Reply (Docket No. 43). In support of the pending motion, the defendant filed a Statement of Undisputed Facts ("DSUF"), to which the plaintiff responded. (Docket Nos. 38, 40.) In opposition to the defendant's motion, the plaintiff filed a Statement of Additional Facts ("PSAF"), to which the defendant responded. (Docket Nos. 41, 46.) The parties have also filed a variety of exhibits in support of their respective briefs, including transcripts of witnesses' depositions and various documentary evidence related to Eren's employment. For the reasons discussed herein, the defendant's Motion for Summary Judgment will be granted.

**<u>BACKGROUND</u>[1]**

---

[1] The facts are drawn from the DSUF and the plaintiffs' responses thereto (Docket Nos. 38, 40), the PSAF and the defendant's responses thereto (Docket Nos. 41, 46), as well as the exhibits filed by the parties in support of their briefs (Docket No. 37, Ex. 3; Docket No. 41, Exs. A-F).

## I.    Overview

In May 2011, Nutro, a subsidiary of Mars, Inc., hired the plaintiff as a Product

Development Manager within the company's Research and Development Department.  Nutro is

a manufacturer of specialty pet food products.  Nutro terminated the plaintiff on August 9, 2012.

## II.    Eren's Employment at Nutro

### A.  Imhoff Hires Eren

Eren was hired by Sebastien Imhoff, who served as Eren's direct supervisor until Eren's

termination.  During Eren's employment, Imhoff held the role of Innovation Manager.  Eren's

position as Product Development Manager was newly created at the time that she was hired.  Her

role was intended to support Imhoff in managing four product development scientists.  Her role

was also created so that she might be considered as a possible successor to Imhoff.

Imhoff testified at his deposition that, when he was interviewing Eren for the Product

Development Manager position, he had concerns about Eren's fit for the position.  (Docket No.

37, Ex. 3 at 163.)  Imhoff testified that he decided to hire the plaintiff, despite his concerns about

her leadership capabilities and business acumen, because he was "really intrigued by" her

MENSA International membership and thought that Eren's high IQ indicated that she possessed

a learning agility that would compensate for her lack of experience. [2]  (*Id.* at 164-65.)

---

[2] Both parties appear to have misunderstood the local and federal procedural rules and their
requirements as to the parties' submissions of brief statements of facts in support of their
respective positions.  As an initial matter, Local Rule 56.01 provides: "In order to assist the
Court in ascertaining whether there are any material facts in dispute, any motion for summary
judgment . . . shall be accompanied by a separate, concise statement of the material facts as to
which the moving party contends there is no genuine issue for trial."  Here, the DSUF is 53
pages long and includes 259 allegedly "undisputed facts," including many facts that are
irrelevant to the merits of the defendant's motion.  Accordingly, the DSUF is decidedly not
concise as required by the rules.  Additionally, both parties appear to have misunderstood the

### B. Eren's Performance at Mars

Eren's job required her to create a productive "high performance" team environment for the product development specialists that she managed, including Yuki Nishimura, Dana Erdman, Krista Zinn, and Heidi Wilson. The product development specialists, who are scientists, are responsible for developing and launching Nutro products. Imhoff testified that, after Eren's first two months at Nutro, he realized that Eren's lack of experience in leadership and business was more significant than he had anticipated and that she was not "learning the ropes" and pace of the business as he had expected. (*Id.* at 166-67.) Imhoff further testified that he noticed, early on in Eren's employment, that she was having difficulty keeping up with the pace of the business and, as a result, that her team was not "going in the right direction."[3] (*Id.* at 168-69.)

In addition to her team and Imhoff, Eren worked with Gealita Greenhill, who served as Nutro's Personnel and Organization Manager. Greenhill was responsible for assisting line

---

rules' provisions setting forth that a party should respond to its adverse party's statement of facts by "disputing" or "admitting" certain facts. Here, both parties have "disputed" facts submitted by their adverse party that are, in reality, undisputed. For example, the defendant submits as an undisputed fact: "In response to Eren's question as to whether she could sleep well the night of July 31st, Imhoff *testified* that he did not feel he could say 'no, you cannot sleep well.'" (Docket No. 40 ¶ 102 (emphasis added).) The plaintiff responded, "Denied. The above statement is not a fact which can be admitted or denied and is therefore denied. Plaintiff is incapable of admitting or denying what Imhoff 'felt he could say.'" (*Id.*) Here, the plaintiff is not disputing the fact as submitted by the defendant. She does not write that Imhoff *did not testify* as the defendant submits; instead, she appears to have failed to closely read the fact asserted by the defendant. The defendant also appears to dispute certain undisputed facts for the purpose of adding context. The purpose of the parties' responses to statements of facts is to identify *genuine issues of material fact* that will need to be addressed at trial. Nevertheless, despite these shortcomings by both parties, in the interest of a timely disposition of the pending motion, the court will consider the parties' statements of facts.

[3] The plaintiff disputes the factual accuracy of Imhoff's testimony regarding her performance at Nutro. (*See, e.g.*, Docket No. 40 ¶¶ 34-35.)

managers in Eren's department with talent development and also for dealing with performance or other issues that associates may have in the workplace.  Greenhill testified that she was first made aware of Imhoff's concerns about Eren's performance in October 2011.

### C.  Eren's Hospitalization in October 2011

In October 2011, Eren was hospitalized for an ulcer.  At the time of her hospitalization, Eren was not yet eligible to take leave under the Family Medical and Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), because she was a new employee.  Nutro agreed to classify Eren's October 2011 hospitalization time as a non-FMLA absence which would allow her to receive short-term disability and 80% of her salary.  Despite Nutro's offer to provide disability leave, however, Eren decided to use vacation time for her October 2011 absence.

It is undisputed that Imhoff knew that Eren went to the emergency room in the fall of 2011, although he did not know the reason that she was hospitalized.  Eren returned to work after her hospitalization.  Eren testified at her deposition that, after returning to work, Imhoff asked her to meet with him.  She testified that he asked her about her hospitalization and she told him that she "had an ulcer before but it was taken care of and I was good."  She further testified that Imhoff responded that Eren was "getting paid over $100,000," and "it's not fair to him or to [the] Mars family that I didn't tell them that I was sick when I started."  (Docket No. 41, Ex. A at 70.) The defendant disputes the factual accuracy of the alleged conversation.  At his deposition, Imhoff vigorously denied that such a conversation ever took place.  (Docket No. 41, Ex. B at 29-30.)

### D.  Eren's Reviews

Nutro holds performance reviews for employees like Eren twice a year: mid-year and at the end of year.  Around the end of 2011, Eren received a year-end performance review.  Her

rating, determined by Imhoff, was "below expectations." Eren's performance review states that she received a "below expectations" rating because she was not meeting the requirements of the position from a leadership standpoint, not providing appropriate direction to her team, and not having the impact that was expected by a leader in her position. (Docket No. 37, Ex. 3 at 180.) At the time a Nutro associate (like Eren) receives a year-end performance review, she works with her managers on setting objectives for improvement for the upcoming year.

In March 2012, following Eren's 2011 year-end review, Imhoff spoke to Greenhill about his ongoing concerns regarding Eren's performance. Imhoff related to Greenhill that he still had concerns about Eren "keeping pace." Greenhill further testified that Imhoff told Greenhill that he was concerned about Eren's business acumen and Eren's tendency to micromanage.

In late May 2012, Eren received a mid-year review from Imhoff. Prior to the mid-year review, Greenhill coached Imhoff on working with Eren and suggested that he needed to be specific with Eren about the performance areas in which she needed to improve. At the mid-year review, Eren received a second "below expectations" rating. In June, Eren met with Imhoff to review her objectives for 2012. At that time, Imhoff and Greenhill decided to take action so that Eren could improve her rating before the end of the year.

**E.  Eren's PIP**

Imhoff and Greenhill decided to place Eren on a Performance Improvement Plan ("PIP") beginning July 13, 2012. (Docket No. 37, Ex. 3 at 212.) A PIP is designed to set clear expectations and goals for an associate to meet over a particular time period. In a memorandum (the "PIP Plan") addressed to Eren and dated July 11, 2012, Imhoff explained the details of Eren's PIP. The PIP Plan stated that Eren's PIP would begin on July 13, 2012, and would run for up to 90 days, assuming that consistent progress was made over the period covered by the

PIP. The memorandum expressly warned that, if sufficient progress was not demonstrated within the first 30 days and throughout the duration of the PIP, Eren may be subject to disciplinary action, including termination. (*Id.*)

Eren's PIP Plan outlined three performance objectives, including "(1) building an effective team by providing greater focus and guidance to her direct reports; (2) demonstrating effective leadership by establishing collaborative relationships . . . throughout the business; and (3) improving decision quality by demonstrating an ability to better define problems and apply breadth of thinking to come up with accurate and business sound decisions." (*Id.*) Imhoff testified that the objectives set forth in the PIP Plan were consistent with the performance areas where he believed that Eren was not meeting his expectations. (*Id.* at 185.) Moreover, Eren admits that she understood that (1) the objectives set forth in the PIP Plan were areas in which Imhoff believed Eren needed to improve, and (2) that the PIP could end before the 90-day period had run.

The PIP Plan set the first formal review date as August 9, 2012. The PIP Plan further noted that informal progress reviews would be held every two weeks to provide an opportunity for coaching, in addition to formal reviews that would take place every 30 days. It appears that the PIP Plan was signed by Eren and Imhoff on July 13, 2012.

The PIP prompted Eren to have a meeting with her team, which she held on July 17, 2012. As a follow-up to the July 17 meeting, Eren asked her team to give her suggestions for improvement. On July 20, 2012, Eren reminded team members to send her their feedback.

     1.  <u>Informal Performance Review on July 31, 2012 and Eren's FMLA Request</u>

Eren and Imhoff met informally to discuss Eren's progress on the PIP on July 31, 2012. With respect to Eren's progress on the PIP as of July 31, 2012, Imhoff testified that he told

Greenhill after the informal meeting that he was unimpressed. Nevertheless, during their meeting on July 31, Eren asked Imhoff "if she could sleep well that night." It is undisputed that Imhoff responded, "Yes."

Eren testified that, in the same meeting and following Imhoff's response regarding Eren's sleep, Eren told Imhoff that she was scheduled to have surgery and that she would possibly take FMLA leave. Eren had first contacted Nutro's nurse about her need to have surgery on July 30, 2012 (after the PIP had already begun).[4] It is undisputed that Eren was sent FMLA paperwork on July 31, 2012, and that Eren never returned any completed FMLA paperwork to Nutro, including any documentation from her physician supporting her request for leave.

2. Eren's Development Plan

As part of the PIP, Eren was to present an action plan on her strategy for leading her team more effectively at the first formal review on August 9, 2012. Imhoff offered to review her presentation before the formal review so that he could provide feedback. He testified at his deposition that he offered his feedback so that he could give Eren the best chance at a successful presentation. Eren sent the presentation to Imhoff in advance on August 7, 2012. In his reply, Imhoff gave feedback and wrote:

> I would like the discussion to be focused on 1 thing. I would like you to share with us (**in 30 minutes**) the topline summary of what you learned from the feedback session you had with your team and how you translated this into an action plan moving forward. Again delivering this in 30 minutes is key as I want the rest of the time to be spent on feedback and discussion.

(*Id.* at 234 (emphasis in original).)

---

[4] Nutro's policy with respect to FMLA leave requires that an employee approach a regional nurse case manager, who handles all FMLA leave.

It is undisputed that Greenhill and Imhoff were in touch regarding Eren's progress on the PIP Plan prior to Eren's first formal review on August 9, 2012. Imhoff recorded feedback related to Eren's progress as of July 31, 2012, on a copy of the PIP Plan. (*Id.* at 239.) The document notes that Eren was not meeting expectations because she was failing to meet deadlines on her objectives and failing to present appropriate strategies in line with the objectives of the PIP Plan.

Greenhill testified that she and Imhoff decided that, if they did not see anything at the August 9 meeting that indicated that Eren would improve over the duration of the PIP, they would terminate Eren. (*Id.* at 147.) Imhoff testified that, prior to the August 9 meeting and when he and Greenhill discussed the possibility of Eren's termination, Imhoff informed Greenhill that Eren was planning to have surgery in August. Imhoff testified that he wanted to make sure that Nutro provided support to Eren in terms of medical coverage for the surgery, even if he and Greenhill decided to terminate Eren. As to the decision of whether to terminate, Imhoff testified that it was "driven by" him as Eren's manager, but that the decision consisted of a conversation between himself and Greenhill. (*Id.* at 197.)

**F. Eren's Formal Review and Termination**

Eren presented her action plan to Imhoff and Greenhill on August 9, 2012. At the end of Eren's presentation on August 9, Imhoff informed Eren that her presentation had not met his expectations. Imhoff testified that he was frustrated that Eren's work did not meet his expectations and that she appeared to have disregarded his coaching. Imhoff further testified that, despite his clear instructions, the presentation was very long.[5]

---

[5] Eren admits that the presentation was long but submits that it was long and failed to meet Imhoff's expectations because Greenhill and Imhoff interrupted her.

At the August 9 meeting, Greenhill and Imhoff offered Eren a severance agreement to provide her with a transition. Pursuant to the severance agreement, Eren was terminated on August 9, 2012 after giving her presentation, but she remained on Nutro's payroll and received benefits, including insurance, for two weeks thereafter. After her termination, Eren underwent surgery related to her ulcer and learned that she suffered from two internal hernias that were causing her stomach pain. Since her surgery in August 2012, Eren has not had to see a doctor for her ulcer or hernias.

Since Eren's termination, her role has not been filled. Her team reports to Imhoff, as they did before Eren was hired.

## III.  Procedural History

On September 29, 2011, Eren filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). Eren's EEOC Charge alleged that she was terminated due to a perceived disability. The EEOC Charge further indicates that the earliest date of alleged discrimination was December 2011, and the latest date of alleged discrimination was August 9, 2012. On February 22, 2013, the EEOC issued a notice informing Eren that it was terminating the process with regard to her charge.

On April 18, 2013, Eren filed this action. Eren filed an Amended Complaint on May 3, 2013. (Docket No. 5.) The Amended Complaint alleges that (1) Nutro discriminated against Eren on the basis of her disability and/or perceived disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), and the Tennessee Disability Act, T.C.A. § 8-50-103 ("TDA"); and (2) Nutro interfered with Eren's attempt to exercise her right of entitlement to leave under the FMLA in violation of 29 U.S.C. § 2615(a)(1).

## ANALYSIS

## I.    Rule 56 Standard

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## II.    The *McDonnell Douglas* Analysis

As an initial matter, Eren's FMLA and ADA claims are analyzed employing the familiar burden-shifting analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined by *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).

The *McDonnell Douglas* framework is properly used where a plaintiff uses indirect or circumstantial evidence to demonstrate that an employer acted with a retaliatory or discriminatory motive. If the plaintiff makes a *prima facie* showing, "the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *Clay v. United Parcel Serv.*, 501 F.3d 695, 704 (6th Cir. 2007). To meet this burden, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for its decision. *Id.*; *see also Berry v. City of Pontiac*, 269 F. App'x 545, 549 (6th Cir. 2008). If the defendant is successful, the burden then "shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful discrimination." *Bryson v. Regis Corp.,* 498 F.3d 561, 570 (6th Cir. 2007). To make this showing, the plaintiff retains the ultimate burden of producing "sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that [the defendant] intentionally discriminated against [her]." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001).

**III.**     **FMLA**

The FMLA provides that an eligible employee is entitled to up to twelve weeks of medical leave in a year in the event of "'a serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 446 (6th Cir. 2007) (quoting 29 U.S.C. § 2612(a)(1)(D)); *see also Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003). The Sixth Circuit recognizes two theories for recovery under the FMLA: "the interference theory, pursuant to 29 U.S.C. § 2615(a)(1), and the retaliation theory, pursuant to 29 U.S.C. § 2615(a)(2)." *Id.*

**A.  Interference Claims under the FMLA**

The FMLA makes it illegal for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). Consequently, if an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred. *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003).

A plaintiff must establish a *prima facie* case of FMLA interference by demonstrating five elements: "(1) [she] was an '[e]ligible employee'; (2) the defendant was an '[e]mployer' covered under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of [her] intention to take leave; and (5) the employer denied the employee FMLA benefits to which [she] was entitled." *Wysong*, 503 F.3d at 447 (quoting *Cavin*, 346 F.3d at 719); *see also Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005). The employee must establish these elements by a preponderance of the evidence. *Sorrell v. Rinker Materials Corp.*, 395 F.3d 332, 335 (6th Cir. 2005) (citing *Cavin*, 346 F.3d at 719).

"Because the relevant issue is whether the employer provided the employee with the entitlements provided by the FMLA, an employer may violate Section 2615(a)(1) regardless of the intent behind its conduct." *Ritenour v. Tenn. Dep't of Human Servs.*, 497 F. App'x 521, 530 (6th Cir. 2012); *Arban*, 345 F.3d at 507. However, because the Sixth Circuit has recognized that "the FMLA is not a strict-liability statute, the mere occurrence of interference with an employee's FMLA rights is not a *per se* FMLA violation." *Id.* (internal citations omitted). If an employer demonstrates a legitimate reason unrelated to the exercise of FMLA rights for taking adverse action against the employee, the plaintiff must rebut the employer's reason by showing that the proferred reason (1) had no basis in fact, (2) did not motivate the adverse employment action, or (3) was insufficient to warrant the adverse employment action. *Id.* (citing *Donald v.*

*Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012)); *see also Grace v. USCAR*, 521 F.3d 655, 670 (6th Cir. 2008). The Sixth Circuit has cautioned that courts should "avoid formalism" in the application of this test, "lest one lose the forest for the trees." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). The court observed that "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not? This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and if so, how strong it is." *Id.*

**B. Eren's FMLA Interference Claim**

Eren alleges that Nutro interfered with her FMLA rights by terminating her employment after she gave notice of her intent to take FMLA leave. Nutro concedes that Eren has set forth a *prima facie* case of FMLA interference for purposes of this motion but argues that it has set forth a legitimate business reason for her termination—her poor performance—and that Eren has not presented sufficient evidence of pretext.

Eren does not dispute that Nutro has set forth a legitimate, non-discriminatory reason for dismissal. Although, as the defendant notes, the plaintiff fails to identify which specific basis for pretext she relies on for her FMLA interference claim, she argues that her performance remained consistently poor throughout her employment and that "the *only* thing that changed was [her] notification of her intent to go on FMLA leave." (Docket No. 42 at 8.) Accordingly, the plaintiff appears to argue that her poor performance was not the actual motivating reason for her termination. To support this contention, the plaintiff appears to rely on three pieces of evidence: first, Imhoff's affirmative response on July 31, 2012, to Eren's question regarding whether she could sleep soundly that night; second, the temporal proximity (nine days) between when Eren

notified Imhoff of her intention to take FMLA leave and her termination on August 9, 2012; and

third, Imhoff's alleged statement regarding Eren's ulcer in October 2011.

     1.  <u>Actual Motivating Factor</u>

As an initial matter, the parties dispute the significance of the temporal proximity of

Eren's request for FMLA leave and her termination on August 9. The plaintiff relies primarily

on cases analyzing claims that require a plaintiff to demonstrate a causal connection between an

adverse employment action and a plaintiff's protected activity in order to set forth a *prima facie*

case of retaliation. *See, e.g.*, *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) (holding that,

"where the temporal proximity between the protected activity and adverse employment action is

acutely near in time," a court may find indirect evidence of a causal connection so as to satisfy

the *prima facie* element of plaintiff's retaliation claim); *Johnson v. Univ. of Cincinnati*, 215 F.3d

561, 582-83 (6th Cir. 2000) (temporal proximity may evince an employer's intent to support an

inference of retaliatory discrimination to set forth *prima facie* case under Title VII); *Moore v.

KUKU Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999) (concluding that plaintiff could

establish a *prima facie* causal connection element of Title VII claim by demonstrating that an

adverse action was taken shortly after a plaintiff filed a complaint with the EEOC). The plaintiff

argues that these cases demonstrate that temporal proximity alone can rebut the defendant's

legitimate, non-discriminatory reason for her dismissal.

The plaintiff's reliance on these cases is misplaced. Indeed, these cases, which discuss

temporal proximity as it relates to an element of a plaintiff's *prima facie* case, are wholly

irrelevant to Eren's burden here, which is to demonstrate that Nutro's preferred reason for her

termination is pretextual. The Sixth Circuit has consistently held that temporal proximity cannot

alone prove pretext. *See Donald*, 667 F.3d at 763; *Asmo v. Keane, Inc.*, 471 F.3d 588, 598 (6th

14

Cir. 2006); *Arban*, 345 F.3d at 403. However, "suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." *Bell v. Prefix, Inc.*, 321 F. App'x 423, 431 (6th Cir. 2009).

The plaintiff submits that three other pieces of circumstantial evidence indicate that Nutro's reason for her dismissal is pretextual: (1) her alleged conversation with Imhoff a year before her termination, during which he allegedly criticized her for keeping her ulcer condition from Mars because it was "unfair to the company," particularly given her salary; (2) her conversation with Imhoff on July 31, 2012, during which Imhoff indicated that Eren could "sleep well" before she notified him about her request for FMLA leave; and (3) the undisputed facts that Imhoff scheduled a team meeting for directly after Eren's formal review meeting and that Greenhill drafted Eren's severance agreement prior to her PIP presentation on August 9.[6] The defendant argues that the conversations between Imhoff and Eren and the routine business circumstances of Eren's termination are insufficient to demonstrate evidence of ill motive. The court agrees.

Alone, as a matter of law, the short nine days between Eren's FMLA request and her termination are insufficient to demonstrate pretext. The significance of the temporal proximity here is also lessened because the date of Eren's termination—August 9—was the date of a

_____

[6] Eren suggests, without evidentiary support, that Imhoff scheduled a meeting with her team directly after her formal review on August 9, 2012 because he planned to terminate her and to tell the team right after firing her. At his deposition, Imhoff testified that the team meeting was, in reality, a birthday gathering for one of the team members. Two team members who attended the meeting, Yuki Nishimura and Krista Zinn (who attended by phone), testified that they did not recall the purpose of the meeting, but they recalled being told in the meeting that Eren was separating from the company. (*See* Docket No. 41, Ex. 3 at 36; Docket No. 41, Ex. 4 at 39.) Another team member, Dana Erdman, testified that the meeting was scheduled on short notice. (Docket No. 41, Ex. 5 at 22.)

formal review scheduled weeks prior to her request for FMLA leave. It is undisputed that, as of July 13, 2012, Eren was aware that she was at risk of termination on August 9, 2012. Similarly, Eren's allegations of negative comments made by Imhoff in October 2011, ten months prior to her termination, are insufficient to support a finding that her poor performance was not the actual motivating factor for her termination. *Adams v. Tenn. Dep't of Fin. & Admin.,* 179 F. App'x 266, 272 (6th Cir. 2006) (concluding that it is well-settled that a plaintiff's self-serving, conclusory statements are insufficient to meet burden as to pretext).

Moreover, the court concludes from the record that Imhoff's isolated and ambiguous encouraging remark to Eren regarding her sleep, even though it occurred prior to Imhoff's awareness of Eren's request for FMLA leave, is insufficient to convince a reasonable factfinder that Imhoff intended to communicate to Eren that her performance issues were resolved and that she was no longer at risk of disciplinary action, including termination. It appears undisputed that, even after that arguably encouraging comment (and before Imhoff learned of Eren's plan to take FMLA leave), Eren was going to remain on her PIP and would still face certain evaluations that could lead to her termination, including her first formal review on August 9.

Upon careful review of the undisputed facts, the court concludes that the plaintiff's assertion that, because she was always a poor performer, "the *only* thing that changed was [her] notification of her intent to go on FMLA leave" is patently inaccurate. On July 13, 2012, a significant change to Eren's employment occurred—she was placed on a PIP Plan that, by its own terms, required her to improve her performance or be subject to disciplinary action, including termination. On August 9, by the express terms of the PIP Plan and by her own admission, Eren failed to demonstrate improvement as required by the PIP and, consequently, she was terminated in accordance with the defendant's common employment practices. The

16

court is similarly unpersuaded by Eren's contention that the defendant's preparation of a severance agreement prior to a review and Imhoff's act of scheduling a meeting with her reports indicates ill motive; such acts appear to constitute routine business measures, which a factfinder is not intended to question based on its own judgment. *Adams*, 179 F. App'x at 272 ("Courts are not intended to act as super personnel departments to second guess an employer's facially legitimate business decisions."); *see also Wilkins v. Eaton Corp.*, 790 F.2d 515, 521 (6th Cir. 1986) ("The factfinder may not focus on the soundness of the employer's business judgment."); *Smith v. Leggette Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000) (finding that "it is inappropriate for the judiciary to substitute its judgment for that of management"). Finally, Imhoff's decision (on behalf of Nutro) to extend Eren's benefits for two weeks following termination so that her surgery might be covered constitutes persuasive evidence that Eren's request for FMLA leave was not, in fact, the actual motivating factor behind her termination.[7]

Accordingly, the court concludes that the plaintiff has failed to demonstrate that a material issue of fact exists as to pretext.[8] Therefore, summary judgment is appropriate for the defendant as to the plaintiff's FMLA interference claim.

## IV.     Disability Discrimination Claim

In her Complaint, Eren alleges that Mars discriminated against her and terminated her because she was disabled in violation of the ADA and the TDA. The ADA and TDA protect

---

[7] The court finds it significant that Imhoff decided to extend Eren's benefits to cover her surgery, even though Eren never returned any FMLA paperwork to her employer, including any medical documentation from a physician substantiating her need for medical leave.

[8] Because the court has concluded that the plaintiff has not demonstrated that a material issue of fact exists as to pretext, it need not address the defendant's argument that it is shielded from liability under the honest belief doctrine.

disabled employees and job applicants from discriminatory treatment. *See* 42 U.S.C. § 12112(a).

A claim brought under the TDA is analyzed under the same principles as those utilized for the

ADA. *Cardenas-Meade v. Pfizer, Inc.*, 510 F. App'x 367, 369 n.2 (6th Cir. 2013) (noting that

the TDA does not require that reasonable accommodation be made).

### A. Standard

Under the ADA, no covered entity shall discriminate against a qualified individual with a

disability in regard to job application procedures, the hiring, advancement, or discharge of

employees, employee compensation, job training, and other terms, conditions, and privileges of

employment. *Id.* Discrimination under the ADA includes an employer's failure to make

"reasonable accommodations to the known physical or mental limitations of an otherwise

qualified individual who is an applicant or an employee, unless such covered entity can

demonstrate that the accommodation would impose an undue hardship on the operation of the

business of the covered entity." *Id.* at § 12112(b)(5)(A); *see Kleiber v. Honda of Amer. Mfg.,*

*Inc.*, 485 F.3d 862, 868 (6th Cir. 2007). Where, as here, the plaintiff seeks to establish

discrimination through indirect, rather than direct, evidence, the Sixth Circuit requires the

plaintiff to establish a *prima facie* case, followed by the familiar *McDonnell Douglas* burden-

shifting analysis. To establish a *prima facie* case under the ADA, Eren must establish that "(1)

she is disabled; (2) she is otherwise qualified for the position, with or without reasonable

accommodation; (3) she suffered an adverse employment decision; (4) the employer knew or had

reason to know of the plaintiff's disability; and (5) the position remained open while the

employer sought other applicants or the disabled individual was replaced." *Whitfield v.*

*Tennessee*, 639 F.3d 253, 258 (6th Cir. 2011); *see also Johnson v. Cleveland City Sch. Dist.*, 443

F. App'x 974, 982-83 (6th Cir. 2011). To be "otherwise qualified" for the job, the employee

bears the burden of showing she can perform the "essential functions" of the job.  *Johnson*, 443
F. App'x at 983.

**B.  Eren's Disability Discrimination Claim**

Nutro argues that it is entitled to summary judgment on Eren's disability discrimination
claims because she has not demonstrated a *prima facie* case of discrimination and, even if she
had, that Eren has failed to demonstrate a material issue of fact as to pretext.  For purposes of the
instant motion, Nutro concedes the first and third elements of Eren's *prima facie* claim.
However, Nutro argues that Eren has failed to demonstrate that (1) despite her disability, she is
"otherwise qualified" for her position, with or without reasonable accommodation; (2) Nutro
knew or had reason to know of her disability; and (3) Eren's position remained open while
searching for candidates or that someone replaced her.

1.  <u>Second Element: "Otherwise Qualified"</u>

Nutro argues that Eren was not qualified for her position because of her severe
performance deficiencies.  The parties agree that, to demonstrate that she is "otherwise
qualified," the plaintiff must show (1) that she satisfies the prerequisites for the position, such as
possessing the appropriate education, employment, and skills; and (2) that she can perform the
essential functions of the position held or desired, with or without reasonable accommodation.
*See Burns v. Coca-Cola Enterprises, Inc.*, 222 F.3d 247, 256 (6th Cir. 2000).  Nutro argues that
Eren fails to satisfy this prong because it is undisputed that Eren consistently performed below
expectations in her role.  In response, Eren contends that she was "otherwise qualified" for her
role because Imhoff hired her for the position in the first place.

In support of its argument, Nutro relies on two district court opinions from within this
circuit: *Van Sickle v. Automatic Data Processing, Inc.*, 952 F. Supp. 1213 (E.D. Mich. 1997),

and *Starks-Umoja v. Fed. Express Corp.*, 341 F. Supp. 2d 979 (W.D. Tenn. 2003). In *Starks-Umoja*, the Western District of Tennessee cited Sixth Circuit cases analyzing whether employees are "otherwise qualified" for purposes of Title VII race discrimination claims (not disability discrimination claims), yet held that a FedEx employee was not "otherwise qualified" under the ADA because she "plainly failed to meet the attendance requirements for a position at FedEx." 341 F. Supp. 2d at 995. Because of her disability, "[s]he continuously arrived late to work, left early, or did not show up at all. She also failed to provide medical documentation for her absences in response to repeated requests from her supervisor." *Id.* (citing *Gantt v. Wilson Sporting Goods, Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998) (holding that, because a plaintiff was not released by her doctor to return to work, she did not meet the second element of her *prima facie* ADA claim, that she be qualified to perform the essential functions of the job)); *see also Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1022 (6th Cir. 2000) (discussing plaintiff's requirement of demonstrating his qualifications as to his Title VII failure-to-promote claim); *Warfield v. Lebanon Correctional Inst.*, 181 F.3d 723, 729 (6th Cir. 1999) (granting summary judgment to defendant-employer as to plaintiff's Title VII claim because plaintiff failed to present evidence sufficient for a jury to find that she was meeting the expectations of her employer because she did not argue that she was qualified for her position and did not dispute the defendant's argument that she had trouble performing essential functions of her job).

Nutro also relies on a 17-year-old case from a district court in Michigan. In *Van Sickle*, without citation to any binding legal authority, the district court held that a plaintiff failed to demonstrate that he was "otherwise qualified" under the ADA because the defendant, the plaintiff's employer, provided evidence that demonstrated that the plaintiff was not performing his job to the satisfaction of the defendant. 952 F. Supp. at 1222 (granting summary judgment to

defendant where employer had warned plaintiff repeatedly that his poor performance may result in termination).

As a general matter, these cases are distinguishable from Eren's action, as they relate to an employee's failure to demonstrate that she was otherwise qualified, *despite her disability*, to perform the essential functions of her job.  Moreover, because it lacks any citation to binding legal authority, the court finds *Van Sickle* unpersuasive.  Here, Nutro does not assert that Eren's poor performance is related, in any way, to her alleged disability.  Moreover, the record reflects that Eren's supervisors considered Eren capable of performing the "essential functions" of her job at the time of hiring and throughout her employment, especially because they chose to give her opportunities to improve, despite the fact that she failed to meet expectations consistently and to match the pace of the role.  Tellingly, Nutro has failed to cite to any binding authority supporting its assertion that, because Eren received poor performance reviews, she cannot demonstrate that she was "otherwise qualified" for purposes of a *prima facie* case under the ADA.  Additionally, despite the evidence in the record that Eren performed her job below Imhoff's expectations, Eren has demonstrated that a genuine issue of material fact exists as to whether or not she was "otherwise qualified" for her position as required by the ADA. Accordingly, the court concludes that Eren has met her *prima facie* burden for the second element of her disability discrimination claim.

2.  <u>Fourth Element: Nutro Knew or Had Reason to Know of Eren's Disability</u>

Nutro contends that Eren has failed to set forth a *prima facie* case because she has not demonstrated that Nutro knew or should have known of her "disability"—i.e., her stomach ulcer. The court agrees with the plaintiff that it is Imhoff's knowledge, as the decision-maker, that is

relevant.[9]  The record contains conflicting testimony from Eren and Imhoff regarding Imhoff's knowledge of her specific ailments.  Eren testified at her deposition that, in October 2011, she told Imhoff that she had been hospitalized for an ulcer.  Eren further testified that, on July 31, 2012, Eren told Imhoff, "I need to tell you I'm going to have to have a surgery. I might have to take time off, depending on how things go."  (Docket No. 41, Ex. A at 68.)  Eren further testified that, in July 2012, she did not tell Imhoff that the surgery would be on her stomach, but she testified that she is "sure" that Imhoff knew the surgery related to her stomach ulcer because Eren's team knew the purpose of the surgery.  (*Id.* at 69-70).  Eren also asserts in her brief that, because Imhoff testified that he had observed that she was not feeling well in the spring and summer of 2012, the defendant has conceded that it knew that she was disabled.

At his deposition, Imhoff testified that he did not know any details related to Eren's upcoming procedure when she notified him about her request for FMLA leave on July 31, 2012.  (Docket No. 41, Ex. B at 85.)  Moreover, although Imhoff testified that he was aware of Eren's hospitalization in October 2011, he further testified that he was unaware of the *reason* for her hospitalization.  Additionally, Imhoff testified that he had noticed Eren feeling sick to her stomach on perhaps one or two other occasions, but he assumed that she might have food poisoning.  (*Id.* at 85-88.)  He testified that, from the events related to Eren's health that he described, he had no understanding that Eren may be suffering from a more serious medical condition.  (*Id.* at 112.)

The plaintiff has identified sufficient evidence in the record to create a genuine issue of material fact as to whether Imhoff knew or should have known that she was disabled.  This

---

[9] It is undisputed that Eren never told Greenhill, the only other person involved in the decision to terminate Eren, about her ulcer.

record supports the plaintiff's assertion that, based on symptoms suffered by Eren in the workplace and her previous incident of hospitalization, a reasonable person like Imhoff, Eren's supervisor for over a year, either knew or should have known of Eren's disability.

### 3. Fifth Element: Position Remained Open or Eren Was Replaced

It is undisputed that Eren was not replaced and that, instead, her position was "put on hold" with respect to hiring a replacement. It is further undisputed that Eren's team now directly reports to Imhoff. Nutro argues that Eren is unable to establish that the position has remained open, and therefore, she cannot satisfy the fifth element of her *prima facie* claim. To the contrary, the defendant has admitted that the position has been "put on hold," and it does not argue that the position has been eliminated or absorbed into another role.[10] Accordingly, a reasonable person may conclude that the position is still open, pending a search for Eren's successor. Therefore, an issue of fact appropriate for trial exists as to the fifth element of Eren's disability discrimination claim.

For these reasons, the court concludes that Eren has set forth a *prima facie* case for disability discrimination under the ADA and TDA. Because the court has already concluded that Nutro has set forth a legitimate, non-discriminatory reason for Eren's termination, the court must now turn to its "common sense inquiry" of whether Eren has provided sufficient evidence to cast doubt on Nutro's preferred reason and, if so, how strong it is.

### C. Pretext

---

[10] The plaintiff's Statement of Additional Facts states: "Eren's position at Nutro has not been replaced; remains open; and is still vacant." (Docket No. 46, ¶ 35.) In response, the defendant states: "Denied as stated. Eren's position at Nutro has not been replaced/filled and is vacant." (*Id.*).

To rebut Nutro's legitimate reason for her dismissal, Eren argues that her poor performance (1) did not actually motivate the defendant's action; and (2) was insufficient to motivate the defendant's action. Eren appears to concede the first basis for pretext as to her disability discrimination claim. As with Eren's FMLA interference claim, Eren has failed to present evidence that establishes that a genuine issue of fact exists as to whether Nutro's reason for her dismissal was pretextual.

1.  Actual Motivating Factor

For substantially the same reasons discussed by the court as to Eren's FMLA claim, the plaintiff has failed to demonstrate that a material issue of fact exists as to whether Eren's poor performance was the actual motivating factor for her dismissal. Eren appears to argue that, because Imhoff knew of her disability and terminated her, that her termination was based upon Imhoff's discriminatory animus. Eren's assertion is unsupported by the record. Moreover, Eren's strongest evidence of discriminatory animus, the alleged comment made by Imhoff about Eren's condition in October 2011, is merely an allegation supported only by Eren's conclusory deposition testimony. It is well settled that a plaintiff's self-serving statements are insufficient to meet her burden as to pretext. *Adams*, 179 F. App'x at 272. Consequently, the plaintiff has failed to demonstrate that a genuine issue of fact remains for trial as to whether Eren's poor performance was the actual motivating factor for her termination.

2.  Insufficient Reason for Termination

Finally, the plaintiff contends that her poor performance was an insufficient reason to cause her termination.[11] She submits, "We know that the results of [Eren's] presentation [on

---

[11] The plaintiff limits her arguments as to the third theory of pretext to her disability discrimination claim.

August 9, 2012] were insufficient to cause her termination because Imhoff had already discussed terminating Plaintiff prior to the meeting, Greenhill had prepared the separation agreement prior to the meeting, and during the meeting, without any conversation with Greenhill, Imhoff summarily terminated Plaintiff."  (Docket No. 42 at 18.)  The plaintiff further argues that, because the PIP was intended to be carried out over the course of 90 days and because Imhoff told Eren on July 31, 2012 that she could sleep well that night, Eren's failure to meet Imhoff's expectations at her presentation on August 9, 2012 was insufficient reason to motivate her termination.

The plaintiff's argument lacks merit.  It is undisputed that the PIP Plan expressly provides that, if sufficient progress is not demonstrated within the first 30 days and throughout the duration of the PIP, Eren would be subject to disciplinary action, including termination.  Moreover, Eren admits that she understood that the PIP could end earlier than 90 days.  Based on the record, the court concludes that a reasonable person could not conclude that Eren's failure to demonstrate improvement in the first 30 days of her PIP, despite receiving coaching from her supervisor, was an insufficient reason for her termination.

Accordingly, the plaintiff has failed to present evidence that demonstrates that Nutro's legitimate, non-discriminatory reason for her termination was pretextual.[12]  Consequently,

---

[12] As a final matter, the parties dispute the appropriate causation standard applicable to Eren's disability discrimination claims.  In *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 314-17 (6th Cir. 2012) (*en banc*), the Sixth Circuit held that the "but for" causation standard governed ADA claims under the pre-2008 version of the statute, which prohibited discrimination "because of an individual's disability."  *Lewis* did not address the amended ADA provision that now prohibits discrimination "on the basis of" an individual's disability.  *See* 42 U.S.C. § 12112(a).  Also, in *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, --- U.S. ---, 133 S.Ct. 2517 (2013), the Supreme Court reinforced that the proper causation standard turns on specific language in each federal anti-discrimination statute.  The Sixth Circuit has not addressed this issue in a post-*Lewis*

summary judgment is appropriate for the defendant as to the plaintiff's disability discrimination claims.

## CONCLUSION

For these reasons, the defendant's Motion for Summary Judgment will be granted. An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

---

opinion. Here, because the plaintiff has failed to demonstrate that a material issue of fact exists as to pretext, the court need not reach this issue.